PAYNE (BOWERBANK v.). See Case No. 1,727.

PAYNE (COTTLE v.). See Case No. 3,268.

PAYNE (POWELL v.). See Case No. 11,358.

---

## Case No. 10,856.

### PAYNE et al. v. SOLOMON.

[14 N. B. R. 162.] [1]

District Court, S. D. New York. April 21. 1876.

**WHAT IS AN ACT OF BANKRUPTCY — PAYMENT OF OVER-DRAFT TO BANK—SECURITIES PURCHASED WITH PROCEEDS OF OVER-DRAFT.**

1. If a debtor purchases gold certificates by means of an over-draft on a bank, under an agreement that the proceeds of all over-drafts of his shall be the property of the bank, or with the preconceived idea of never paying back the money obtained by the over-draft, but of defrauding the bank, a transfer of the certificates to the bank is not an act of bankruptcy.

2. If a bank merely certifies the check of a debtor in advance, relying on his promise to make his account good during the day, such an over-draft, in the absence of fraud, creates simply the relation of debtor and creditor, and the payment of such a debt after insolvency occurs is an act of bankruptcy.

3. A mere agreement by a debtor, that in a certain event he will deliver to the bank such securities as he may purchase with the proceeds of overdrafts, will not vest a title to the securities in the bank, so that a transfer of them will not be a preference.

4. There is a distinction between an agreement that securities purchased with the proceeds of an over-draft shall all the time be considered the property of the bank, and an agreement to turn over the title, as a future act.

5. Where the defence is, that the securities belonged to the alleged creditor on account of fraud, the burden of proof is on the debtor to establish the fraud and the identity of the securities by a fair preponderance of evidence.

---

[1] [Reprinted by permission.]

Petition for an adjudication of bankruptcy against Solomon. Two acts of bankruptcy were alleged, viz., that on May 29th, 1875, [Samuel L.] Solomon, being insolvent, paid to the Continental Bank. as a creditor, thirty thousand dollars, with intent to prefer, and that on June 1st, 1875, he paid the same bank, as a debt to creditor, fifteen thousand dollars, with intent to prefer. The petitioners [Francis E. Payne and others] offered in evidence an affidavit of Solomon, made in another case, stating transactions with the bank, which, prima facie, made out the acts of bankruptcy alleged. The proceeding to adjudge Solomon bankrupt was, by his consent and permission, defended by the Continental Bank in his name. The bank produced evidence for the purpose of showing the following facts: Solomon had been a dealer with the bank for some time prior to May 28th, 1875. He had an arrangement by which he agreed to make all over-drafts and certifications good by 3 p. m. of each day, and until he did so whatever property be bought with the proceeds of over-drafts and certifications was to belong to the bank. The evidence on this point was given by the president and cashier, and it was claimed, by the petitioners, that whatever the evidence established was of too vague and uncertain a character to constitute a lien or right of property. On May 27th, 1875, Solomon made three purchases of gold: one from George D. Arthur & Co., of five thousand dollars, one from James B. Colgate & Co., of twenty thousand dollars, and one from White, Morris & Co., of twenty thousand dollars, the price of the gold varying from 116⅛ to 116 3/10. The gold was to be paid for and delivered on the next day, the 28th. On the 28th, between 10 and 11 a. m., Solomon called for the gold, and received it, in the cases of White, Morris & Co. and George D. Arthur & Co., in the shape of gold certificates, which he paid for in currency checks on the Continental Bank, receiving the gold certificates over the counter. He received from Colgate & Co. their gold check, which he took to the bank on which it was drawn, and obtained payment for it in gold certificates. He paid Colgate & Co. in a certified check on the Continental Bank. The checks which he gave White, Morris & Co. and George D. Arthur & Co., were also certified by the Continental Bank. All the certifications were made by 11 o'clock, and amounted in the aggregate to fifty-three thousand dollars, leaving Solomon overdrawn about forty-five thousand dollars. At 12 o'clock he sent his brother to tell the president of the bank that he had failed. The president called at his office, but could get no definite information about his condition. Subsequently, the president sought for him at his office and residence, and failed to find him, but, getting an accidental clue, went to West Hoboken, on May 29th, and found him there at the dwelling of a relative. Solomon complained that he was very sick, and said he had no money; but that with the aid of relatives, who, he said, were wealthy, he might be able to repay the bank in twelve months. Finally, however, he opened his vest and took out thirty thousand dollars in gold certificates, which he gave to the president, and he also gave him his own note for ten thousand dollars, payable in one year. The next two days (Sunday and Monday) were holidays, but on Tuesday he came to the bank, and gave the president a gold certificate for five thousand dollars, and one hundred shares of Western Union Telegraph stock, and the president gave him two thousand five hundred dollars in bills, and certified his two checks, one for nine hundred dollars, and one for fifteen dollars. There was no evidence of the value of the telegraph stock.

A. Cardozo and Julius J. Lyons, for petitioning creditors.
F. N. Bangs and Develin, Miller & Trull, for the Continental Bank and the debtor.

BLATCHFORD, District Judge (charging jury). I shall not detain you long, gentlemen, in submitting to you the questions in this case. Your intelligence has apprehended, I am sure, the questions of law and the questions of fact involved. The questions of fact and the questions of law have been very clearly stated by the counsel on both sides, and the questions of fact have been summed up to you by them with great distinctness and clearness, and entirely to your apprehension.

There are two acts of bankruptcy alleged in the petition in this case, upon which you are to pass. The first one is, that, on the 29th of May, 1875, which was Saturday, Mr. Solomon, being insolvent, with intent to give a preference to the Continental National Bank, paid to that bank, as a creditor of his, the sum of over thirty thousand dollars. The second act of bankruptcy is, that he did the like thing on the 1st of June, to the amount of over fifteen thousand dollars. This transaction of the 1st of June, based upon the fifteen thousand dollar matter, evidently was intended to cover the five thousand dollar gold certificate, and the one hundred shares of Western Union Telegraph stock. I allude to that branch of the case first, for the purpose of saying that you are to dismiss entirely from all consideration in this case the matter of the Western Union Telegraph stock, for this reason: The evidence is, that Mr. Solomon, on the morning of Tuesday, the 1st of June, came to the bank himself, and brought with him on that occasion a five thousand dollar gold certificate issued by the government, and representing so much gold in the treasury, and also a certificate for one hundred shares of Western Union Telegraph stock. and put the documents representing these two kinds of property into the hands

of Mr. Bard, who says that within two minutes after they came into his hands he went around the counter, and got two thousand five hundred dollars in bills, and gave them to Mr. Solomon. Thereafter, the five thousand dollar gold certificate and the one hundred shares of the Western Union Telegraph stock were put into the hands of Mr. Ponder, by Mr. Bard, as requested by Mr. Solomon at the time he brought them, and were sold by Mr. Ponder, and the proceeds were turned over to the bank. It has not been shown what the Western Union Telegraph stock sold for, or what its value was; but it does appear that this advance of two thousand five hundred dollars was made at this time upon the deposit of these two securities. Under these circumstances, irrespective of the check for nine hundred dollars, which was afterward paid by the bank, and a check, I think, for fifteen dollars or twenty dollars, the state of the evidence is such as to authorize the court to say that the transaction, so far as it concerns the Western Union stock, is to be thrown entirely out of the case, and is in no manner to be considered by you. It is in no manner to enter into the views you may take of the transactions in regard to the gold certificates, either those that were paid over to Mr. Bard, at Hoboken, or the five thousand dollar gold certificate which was brought on Tuesday, the 1st of June.

In respect to those gold certificates, it is proved very distinctly that the bank paid and honored Mr. Solomon's three checks to the order of these respective parties, George D. Arthur & Co., James B. Colgate & Co., and White, Morris & Co., to the amount of fifty-two thousand dollars and over. It is also shown very clearly that with those checks Mr. Solomon purchased, from George D. Arthur & Co., twenty thousand dollars in gold, from James B. Colgate & Co., twenty thousand dollars in gold, and from White, Morris & Co., five thousand dollars in gold, and that he received this forty-five thousand dollars in gold into his hands in the shape of gold certificates issued by the government of the United States. As to these facts there is no dispute. It is alleged, as a defence, in this case, by Mr. Solomon, that, in turning over to the bank the gold certificates to the amount of thirty thousand dollars, which he turned over at Hoboken, and the five thousand dollars, which he turned over on the Tuesday morning following, being thirty-five thousand dollars of gold certificates in all, he was not guilty of any violation of the bankruptcy act in such wise that he therein committed an act for which he ought to be adjudged a bankrupt; in other words, irrespective of the question of insolvency at the time, it is set up by Mr. Solomon that the gold certificates which he so turned over were really and truly not his own property but the property of the bank, and that they became the property of the bank, and were the property of the bank, by reason of one or the other of the two methods that have been argued before you—either by virtue of a previous agreement. under which the over-drafts were made, or by virtue of the fact that he obtained the over-drafts with a preconceived idea of not paying back the money obtained by the over-drafts, but with the preconceived idea of defrauding the bank of that money, and that, therefore, in judgment of law, no title to the money or to its proceeds—the securities into which the money was converted—was vested in Mr. Solomon by the transaction. The court charges you, as matter of law, that if this preconceived idea of committing this fraud did exist, and if the money was obtained by means of these over-drafts, with that preconceived idea of committing this fraud, of not paying back the over-drafts, but of appropriating the proceeds of that money to his own use, or if there was a previous agreement that the securities purchased with the proceeds of over-drafts should be the property of the bank, so far as such securities should remain in the hands of Solomon, and not be passed away to bona fide purchasers or owners, then, if the proceeds of these over-drafts can be traced to and identified with these thirty-five thousand dollars of gold certificates, a perfect defence has been made out. The first question is, therefore, whether the proceeds of these over-drafts have been, to the satisfaction of the jury, traced to and identified with these thirty-five thousand dollars of gold certificates; in other words, whether it is shown to your satisfaction that these gold certificates were purchased by Mr. Solomon with the money he obtained on these three over-draft checks; because, if that is not shown to your satisfaction, the foundation of the defence fails. If you shall be satisfied that these gold certificates were purchased with the money obtained on these checks, if you shall, as reasonable men, upon the evidence, identify these certificates, which it is very clear Mr. Solomon received, some at the Bank of New York, on the check of Colgate & Co., and the others directly at the offices of the two parties who sold the gold, with the gold certificates that were handed over at Hoboken, and with the five thousand dollar gold certificate that was handed over on Tuesday morning, the 1st of June, then you will proceed to solve the other two questions in the case. In determining the question of the identity of these gold certificates, you are to take into consideration, not only the affirmative evidence given in the case on the subject, but you have a right to take into consideration the fact of the absence of evidence, to show that Mr. Solomon had purchased, and had in his possession, any other gold certificates than these gold certificates which it is clearly shown he had purchased, and did take into his possession, and did purchase, as the evidence is very distinct, with the very money obtained on these over-drafts; because it was the very checks themselves, and not the proceeds of the

checks, that he passed over to the parties who sold him the gold. That is all that I deem it necessary to say to you on that branch of the case. It is for you to say, on the evidence, what your view is, as to whether these gold certificates are satisfactorily identified with the gold certificates which passed into the possession of Mr. Solomon. If you solve that affirmatively, if the identity is established to your satisfaction, then you will consider the other propositions. If you find either of the other propositions to be established, in addition to the proposition of the identity of the gold certificates, you will find in favor of the debtor; that is, if you find either that there was this previous agreement, or, if there was no such previous agreement, if you find that these over-drafts were obtained by Mr. Solomon, with the preconceived idea of committing a fraud by not making good his over-drafts, but by taking the money or its proceeds and appropriating the same to his own use.

Now, gentlemen, upon the question of the previous agreement. You have been addressed by the counsel on both sides on that subject. The evidence has been brought to your attention, and all that I need say to you on the subject is this—that the agreement must be made out by clear and distinct evidence. It must not be left to conjecture. You must be satisfied, not only, that an agreement was made, but you must be satisfied as to what the agreement was. You must be able to say what it was distinctly from the evidence, and you must also be satisfied that the agreement was, that the securities purchased with the proceeds of the over-draft checks, should, while remaining in the possession, custody, and control of Mr. Solomon, be still the property of the bank at any time the bank chose to reclaim them as its own. And, upon the other branch of the case, as to preconceived fraud, you must be satisfied by clear, distinct, and satisfactory evidence, that Mr. Solomon, when he obtained the money on the over-drafts, at that time, which of course extends not merely to the time when he drew the checks, but to the time when the checks were in fact certified by the bank, had this preconceived idea of committing this fraud. And, as I said before, if, in addition to the conclusion, you come to it that these gold certificates are identified, you shall be satisfied that either of these other propositions is made out,—either the one or the other of them—either the prior agreement or the preconceived idea to commit this fraud, then your verdict will be in favor of the debtor; otherwise, in favor of the creditors.

I am asked to instruct you on certain propositions, and I shall instruct you in accordance with them, so far as they seem to me to be consonant with the law. If you believe that the defendant was insolvent on the 28th of May, 1875—and as to that there is no dispute—and that he thereafter made a payment or conveyed property belonging to him to the Continental Bank, with intent to give it a preference, the verdict must be for the plaintiffs. If you shall find that this property did belong to him, then there is no dispute whatever in the case, that the giving it over to the bank was with intent to give the bank a preference; because, under such circumstances, the bank stood as a naked creditor. The simple question is—was the property property that belonged to Solomon, or was it the property of the bank, either by virtue of the previous agreement, or by virtue of his preconceived fraud? So, if you find the fact of insolvency, and of such payment or conveyance of property belonging to Mr. Solomon, then the law deduces his intent in the transaction to have been to give the preference, and the verdict should be for the plaintiffs. These propositions are the correlatives, the obverse, of the propositions that I previously stated to you. So, also, I charge you, that if the transaction between the defendant and the Continental Bank was only that of an ordinary over-draft, that is, unaccompanied by any previous agreement or any preconceived fraud, the bank merely certifying his checks in advance, relying upon his promise to make his account good during the day, which promise would be implied in an over-draft, even though no express promise were made, then such an over-draft as that created simply the relation of debtor and creditor between the defendant and the bank, and, under such circumstances, a payment by Mr. Solomon with his own property or money to the bank, after insolvency, was an act of bankruptcy, and the plaintiffs would be entitled to recover. So, also, I charge you, that unless the prior agreement was that the moneys overdrawn by him should be invested by him as the agent or trustee of the bank, then the bank, in parting with the money, became only the creditor of the defendant, unless this money was obtained with the preconceived fraudulent intent which has been referred to. That is substantially what I have heretofore charged you. So, also, I charge you, that to make out a prior agreement of the kind to which I have referred, the money drawn should continue to be the property of the bank, or the securities into which it should be converted should continue to be the property of the bank; the evidence should be clear to that effect, otherwise, the verdict should be for the plaintiffs. That is a rule applicable to your consideration of that branch of the case. So, also, I charge you, on the subject of this prior agreement, that a mere promise or agreement by Mr. Solomon, that, in a certain event, he would deliver to the bank such securities as he might purchase with the over-drawn funds, would not vest the title to such securities in the bank, or authorize it to take them as the property of the bank. The meaning of that is this—

that, if the agreement shall be found by you to be that Mr. Solomon merely said to Mr. Bard—If anything happens to me, any pecuniary trouble, and if I have on hand any securities that I have purchased with funds that I have obtained by overdrawing you, I promise you I will turn out those securities to you—but nothing more than that, that of itself does not amount to an agreement that the securities shall be, from the time they are purchased, all the time the property of the bank; but amounts simply to a promise, by Mr. Solomon, that he will turn out to the bank such securities as he may have on hand; and, for the violation of such a promise as that, Mr. Solomon would be liable to a suit by the bank; but the bank would have no right or title in the securities, so as to be able to reclaim them as their own, by an action of replevin, for instance, as their specific property. The distinction is very clear between an agreement that those securities shall, all the time they are in his hands, be considered a trust fund, and really the property of the bank all the time, and a mere promise by him that he will, as a future act, turn over to them the title. It is the distinction between an agreement that the title shall, ipso facto, vest at the time of the purchase, and continue all the time in the bank, and the promise that, under a certain contingency, he will turn over such title at a future day; and the agreement which must be made out is one which would enable the bank to reclaim the securities as its own, without any future turning over by Mr. Solomon, or any future act of delivery, or any future concession by Mr. Solomon. I think that distinction and that proposition must be very clear to gentlemen of your intelligence, as it is very clear in judgment of law. And, as I said before, in the absence of any such agreement as that, the bank had no right to follow the proceeds of the over-drafts as its own property, unless you should find, on the other branch of the case, that there was this preconceived fraudulent intent never to pay back the amount of the over-drafts.

I believe, gentlemen, I have touched upon all the points that it is necessary for me to comment upon. I shall not go over the evidence, either the oral evidence or that to be found in the written affidavit of Mr. Solomon, which was read here and has been commented upon. The questions of fact I have endeavored to present to you in such a way, in connection with the rules of law, that I think you can apprehend very distinctly the points I have submitted for your consideration. I commit the case, therefore, now to your consideration.

A Juror: At what time in the day did Mr. S. N. Solomon notify Mr. Ezekiel Solomon that he had failed?

THE COURT: I will tell you. Ezekiel Solomon says: "Mr. S. N. Solomon called at my office about 10 o'clock on Friday, the 28th of May, and informed me that he had failed. Later in the day, about an hour after that, he asked me to go to the Continental Bank, and inform Mr. Bard, the president, that he had failed. I afterwards went to the bank, and told Mr. Bard that my brother requested me to call there and tell him that he had failed." Then, on that subject, Mr. Bard says that "Mr. Ezekiel Solomon came in and inquired for me, and told me he came to see me by request of his brother, and that he was in trouble. He told me that his brother was ill, in distress, and suffering in his head. I asked him where he was; he said he left him at the office; that he was going home. I expressed surprise at his doing so without seeing me, and Mr. E. Solomon apologized, by saying that he was ill. I immediately went to S. N. Solomon's office, saw him in his office, and stated to him certain things." But, on the subject of the hour of the day, Mr. Bard states nothing that I recollect. "The overdraft occurred about 11 o'clock. I learned it from the paying teller. The over-draft was by the certification of these checks." But the hour that he went to Solomon's office, or the hour that Mr. E. Solomon knew of the failure, is not stated by Mr. Bard.

Mr. Cardozo: The affidavit states that at all times in 1875, up to about 12 o'clock on the 28th of May, he was a member of the stock exchange, etc. There are two requests which have been suggested to me: First, in regard to the preconceived fraud, I ask the court to say to the jury that the presumption of law is one of innocence, and that the defendant has the burden of showing that he acted dishonestly, and, if the jury have a reasonable doubt, it should be resolved against the debtor. Second, that the burden of proof is on the defendant, to show that the moneys from the over-drafts bought those particular gold certificates which are in question, and none other, and, if the jury have reasonable doubt about it, the verdict should be against the defendant.

THE COURT: I have stated to you that the burden of proof is on the defendant; and that, as to the preconceived idea of fraud, and also as to the identity of the gold certificates, he has to make out his defence, as in all other civil cases, by a fair preponderance of evidence, to your satisfaction, as reasonable men. The rule is not as in criminal cases, that, if there is a reasonable doubt, it is to be resolved in favor of the defendant. It is a question of a fair preponderance on both those points, on which undoubtedly the defendant is to make out a defence to your satisfaction.

Mr. Bangs: I ask the court to charge that the presumption of law is that the defendant did not intend any violation of the bankrupt law; and that the burden is upon the

petitioners of making out a knowing and intentional violation of the bankrupt law on the part of the defendant.

THE COURT: I decline to charge that, on the ground that, unless it is shown by the defendant that these gold certificates are identified in the way in which I stated, and unless it is shown that one or the other of the two propositions is true, on the undisputed facts in the case, an act of bankruptcy has been committed, and the verdict must be for the plaintiffs.

The jury retired, and after some little absence brought in a verdict for the debtor.